UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WBCMT 2003-C9 ISLAND
LIVING, LLC,

    Plaintiff,                                       Case No. 14-cv-14243
                                              Hon. Matthew F. Leitman

v.

SWAN CREEK LIMITED
PARTNERSHIP,

    Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION TO TERMINATE THE RECEIVERSHIP AND DISTRIBUTE PROCEEDS (ECF #44)

In this action, Plaintiff WBCMT 2003-C9 Island Living ("Island Living") alleges that Defendant Swan Creek Limited Partnership ("Swan Creek") breached its payment obligations under a promissory note. The note was secured by a mortgage on a mobile home park owned and operated by Swan Creek.

During the course of these proceedings, the Court appointed a receiver to operate the park. In discharging his duties, the receiver collected rents from tenants of the park.

Island Living ultimately foreclosed on the park, and it placed the highest bid at the foreclosure sale. Then, just prior to the end of the statutory redemption period, Swan Creek exercised its redemption rights and reclaimed the park. At the time of

1

Swan Creek's redemption, the receiver had roughly $650,000 (in rents and other charges) in his possession that he had collected during his operation of the park. Swan Creek insists that Island Living has no right to these funds.

Swan Creek has now filed a motion in which it seeks an order (1) terminating the receivership and (2) directing that the funds the receiver had collected at the time of the redemption be distributed to Swan Creek. (*See* ECF #44.) For the reasons explained below, the Court **DENIES** the motion.

# I

## A

In November 2003, Swan Creek obtained a $4.35 million loan from lender LaSalle Bank, N.A. to purchase a mobile home park in New Boston, Michigan. (*See* ECF #1-4.) Swan Creek executed three documents in connection with the loan: a Promissory Note (*see id.*); a Mortgage (*see* ECF #1-5); and an "Assignment of Leases and Rents" (the "Assignment of Rents") (*see* ECF #1-6) (collectively, the "Loan Documents"). Island Living later acquired LaSalle Bank's interests (as lender) in the Loan Documents after a series of assignments. (*See* ECF #1-8; *see also* First Am. Compl. at ¶¶ 18-20, ECF #11 at Pg. ID 300-02.)

Several aspects of the Loan Documents are relevant to Swan Creek's motion. First, in the Assignment of Rents, Swan Creek assigned to the lender all right, title, and interest in all present and future rents collected from tenants of the park:

> Section 1.1 **Property Assigned**. Borrower hereby absolutely and unconditionally assigns and grants to Lender the following property, rights, interests and estates, now owned, or hereafter acquired by Borrower:
>
> . . .
>
> (c) **Rents**. All rents, additional rents, revenues, income, issues and profits arising from the Leases and renewals and replacements thereof and any cash or security deposited in connection therewith and together with all rents, revenues, income, issues and profits from the use, enjoyment and occupancy of the Property, and all royalties, overriding royalties, bonuses, delay rentals and any other amount of any kind or character arising under any and all present and all future oil, gas and mining Leases covering the Property and any part thereof, and all proceeds and other amounts paid or owing to Borrower under or pursuant to any and all contracts and bonds relating to the construction, erection or renovation of the Property, whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the **"Rents"**).

(Assignment of Rents at § 1.1, ECF #1-6 at Pg. ID 94-95.)

Second, the Assignment of Rents granted Swan Creek a revocable license to collect the rents and sums due from tenants of the park:

> Section 2.1 **Present Assignment and License Back**. The parties intend that this Assignment grants a present, absolute, and unconditional assignment of the Leases, Rents, Leave Guaranties and Bankruptcy Claims, Proceeds, and Other Rights and shall, immediately upon execution, give Lender the right to collect the Rents and other sums due under the Lease Guaranties and to apply them in payment of the Debt. Such assignment and grant shall continue in effect until the Debt is paid in full and all of the Other Obligations are fully satisfied. Subject to the

> provisions set forth herein and provided there is no Default, Lender grants to Borrower a revocable license to enforce the Leases and collect the Rents as they become due (excluding, however, any Lease termination, cancellation or similar payments which Borrower agrees shall be held in trust and turned over to Lender for credit to principal under the Loan) . . . .

(*Id.* at § 2.1, Pg. ID 96.)

Third, the Assignment of Rents provides that Swan Creek's license to collect rents terminates in the event of a default (as defined by the Loan Documents), and in the event of such a default, the lender has the exclusive right to collect the rents:

> Section 3.1 **Remedies of Lender**. Upon or at any time after the occurrence of … an Event of Default . . . the license granted to Borrower in **Section 2.1** of this Assignment shall be automatically revoked, and Lender shall immediately be entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property.
>
> ∗∗∗
>
> Section 6.2 **Assignee's Rights**. Notwithstanding anything herein to the contrary, Assignee shall be entitled to all the rights and remedies conferred by (MCLA 554.231, *et seq.*), (MCLA 554.211, *et seq.*) to the extent applicable, and (MCLA 554.81, *et seq.*) Upon the occurrence of an Event of Default and without any action by Assignee, Assignor shall have no further right to collect or otherwise receive such Rents, which will be the absolute and sole property of Assignee, pursuant to those statutes.

(*Id.* at §§ 3.1, 6.2, ECF #1-6 at Pg. ID 97, 103.)

Fourth, like the Assignment of Rents, the Mortgage provides that in the event of Swan Creek's default, the rents would belong to the lender:

> Lender shall be entitled to all the rights and remedies conferred by (MCLA 554.231, *et seq.*, (MCLA 554.211 *et seq.*) to the extent applicable, and (MCLA 554.81, *et seq.*). Upon the occurrence of an Event of Default and without any action by Lender, Borrower shall have no further right to collect or otherwise receive such Rents, which will be the absolute and sole property of Lender pursuant to those statutes.

(Mortgage at § 52(b), ECF #1-5 at Pg. ID 82.)

Each of the Loan Documents have a choice of law provision that specifies that the agreements are governed by Illinois law. (*See* Promissory Note at § 10.7, ECF #1-4 at Pg. ID 38; Mortgage at § 35, ECF #1-5 at Pg. ID 77-78; Assignment of Rents at § 5.7, ECF #1-6 at Pg. ID 102.) The Loan Documents also provide that they are subject to certain of Michigan's mortgage and assignment of rent statutes. (*See, e.g.*, Mortgage at Pt. II, ECF #1-5 at Pg. ID 81-83; Assignment of Rents at § 6.2, ECF #1-6 at Pg. ID 103.)

**B**

Under the Promissory Note, Swan Creek was required to make a final balloon payment of $3,691,016.83 on December 1, 2013. (*See* Promissory Note at Ex. A, ECF #1-4 at Pg. ID 44.) Swan Creek did not make that payment. (*See* First Am. Compl. at ¶¶ 22-24, ECF #11 at Pg. ID 303-04.) In a letter dated January 16, 2014,

the loan servicer notified Swan Creek that it was in default due to its failure to make the balloon payment. (*See id.* at ¶ 25, Pg. ID 304.)

Prior to Swan Creek's default, interest accrued on Swan Creek's loan at the note interest rate of $289.77 per day. (*See* Promissory Note at § 2, ECF #1-6 at Pg. ID 28; First Am. Compl. at ¶ 26, ECF #11 at Pg. ID 304.) After the default, an additional $510.18 in default interest accrued each day. (*See* First Am. Compl. at ¶ 26, ECF #11 at Pg. ID 304.) As of July 1, 2014, Swan Creek owed a total of a $3,932,758.92 in unpaid principal and interest. (*See id.*)

## C

Island Living filed this action on November 4, 2014. (*See* ECF #1.) Island Living also moved for the appointment of a receiver to operate the mobile home park and to collect rents from the park's tenants. (*See* ECF #2.) It thereafter filed a First Amended Complaint on November 26, 2014. (*See* ECF #11.) In the First Amended Complaint, Island Living asserts claims for breach of contract and injunctive relief. (*See id.*)

On January 9, 2015, this Court entered an order granting Island Living's request to appoint a receiver. (*See* ECF #15.) By subsequent order, the Court appointed CFLane Receiver, LLC, through its authorized agent Victor Roth, as the Receiver. (*See* ECF #18.) That order authorized the Receiver to distribute funds in

6

excess of the park's operating expenses to Island Living in order to satisfy all of Swan Creek's financial obligations under the Loan Documents:

> Should the Receiver have funds in excess of the anticipated Operating Expenses, including an appropriate reserve in an amount to be approved by Plaintiff, for the Mortgaged Property, the Receiver shall provide all such funds, on a monthly basis, to Plaintiff. All such funds shall be applied to the amount owed to Plaintiff by the Defendant under the Mortgage for the Mortgaged Property. To the extent that there are any funds that exceed amounts due to Plaintiff under the Loan Documents, such funds shall be subject to further order of the Court.

(*Id.* at ¶ 11, Pg. ID 360-61.)

The order also required the Receiver to "submit to this Court for its *in-camera* inspection and serve on the parties who have filed appearances a monthly accounting of all receipts and disbursements concerning the performance of its duties under this Order, and a final accounting within 90 days after termination of the receivership." (*Id.* at ¶ 13, Pg. ID 362.)

Finally, the order required Island Living to "file status reports with the Court on the last business day of every month until such time as the receivership terminates. . . ." (*Id.* at ¶ 20, Pg. ID 363.) Pursuant to that order, each month, Island Living filed with the Court (1) a report detailing actions it had taken with respect to the mobile home park and (2) a report from the Receiver (the "Monthly Reports"). (*See, e.g.*, ECF ## 19-43.)

7

The Monthly Reports explained that Island Living was conducting property assessments, engaging in sales discussions, and conducting research related to a potential sale of the park. Below is a sampling of the information that was included in the Monthly Reports:

- **February 2015 report:** On December 22, 2014, Island Living first published its Notice of Mortgage Foreclosure Sale by advertisement. (*See* ECF #19.) The disclosure sale was originally scheduled for January 22, 2015, but Island Living adjourned the sale "to allow for the completion of third-party reports (*e.g.*, environmental reports) and to obtain necessary internal approvals for bidding instructions." (*Id.*)

- **April 2015 report:** The foreclosure sale was delayed after Island Living "discovered that there are approximately 50 mobile homes on the Property which may be owned by an affiliate of the Defendant." (ECF #21.) Island Living was "actively investigating how to address these homes in light of the pending foreclosure sale." (*Id.*)

- **May 2015 report:** Island Living contacted the owner of the fifty homes at issue (a Swan Creek affiliate) to discuss how to address these homes in the foreclosure process. (*See* ECF #22.)

- **August 2015 report:** Island Living's counsel communicated with counsel for the Swan Creek affiliate that owned the fifty homes concerning the foreclosure and its effect on the homes. (*See* ECF #25.)

- **September 2015 report**: Island Living, Swan Creek, and Swan Creek's affiliate "discussed a potential collaborative sale of the property and the homes following foreclosure" and "these discussions continue[d]." (ECF #26.)

- **November 2015 report:** Island Living's discussions with Swan Creek and Swan Creek's affiliate continued, and Island Living was "seek[ing] documents which show which individual(s) are allowed to enter into such an agreement on behalf of Borrower and the Borrower-affiliated owner of the homes." (ECF #28.)

8

- **February 2016 report:** Island Living, Swan Creek, and Swan Creek's affiliate continued to discuss a collaborative sale, and the Receiver was awaiting an appraisal for the park. (*See* ECF #31.)

- **May 2016 report**: The "Receiver obtained and provided to the parties an appraisal of the Property on May 23, 2016" and "[t]he parties [were] currently reviewing the appraisal." (ECF #34.)

- **June 2016 report:** Swan Creek made an offer to purchase the park on June 13, 2016, and Island Living rejected that offer on June 23, 2016. (*See* ECF #35.)

- **July 2016 report:** Island Living and Swan Creek's affiliate scheduled a meeting with the appraiser to discuss the appraisal of the park. (*See* ECF #36.) Island Living also "received an inquiry from another potentially interested purchaser of the Property, and has provided information to that party." (*Id.*)

- **August 2016 report:** The Receiver advised Island Living that two bids for repairs due to safety issues were underway. (*See* ECF #37.) Island Living notified Swan Creek of the repairs. (*See id.*)

### D

In November 2016, Island Living commenced foreclosure (by advertisement) proceedings against the park. (*See* ECF #40.) The Sheriff's sale for the park was held on December 1, 2016. (*See* ECF #41.) Island Living was the highest bidder at the sale, and it purchased the park for $4,105,012.89. (*See id.*)

Under Michigan law, the Sheriff's sale was followed by a six-month redemption period during which Swan Creek had the option to redeem the park from Island Living. *See* Mich. Comp. Laws § 600.3240(7). The redemption period was set to expire on June 1, 2017. On May 26, 2017, Swan Creek exercised its right to

redeem the park by paying Island Living the redemption amount of $4,209,062.41.[1] (Ex. G to Pl's Supp. Br., ECF #60-8 at Pg. ID 1298.)

Even after Swan Creek paid Island Living the redemption amount, Swan Creek still owed in excess of $650,000 under the Promissory Note. (*See* Pl's Supp. Br., ECF #60 at Pg. ID 1167-68; Tr. of July 27, 2017 Hearing, ECF #57 at Pg. ID 1131-37[2].) This amount was comprised primarily of default interest that had accrued as a result of Swan Creek's default. (*See* Def's Second Supp. Br., ECF #61 at Pg. ID 1402.)

## E

After Swan Creek redeemed the park, the Receiver still held roughly $650,000 in its account (the "Funds"). (*See* Ex. I to Pl's Supp. Br., ECF #60-10 at Pg. ID 1305-06.) A portion of the Funds represented rents that the Receiver collected from tenants of the park.

---

[1] Under Michigan law, the redemption amount is "the amount that was bid for the entire premises sold [at the Sheriff's sale], interest from the date of the sale at the interest rate provided for by the mortgage," and certain fees specified by the statute. Mich. Comp. Laws § 600.3240(2).

[2] During the portion of the hearing cited above, counsel for Swan Creek acknowledged that the amount claimed owing by Island Living under the Loan Documents was "in the ballpark" of the amount actually due under the Loan Documents (Tr. of July 27, 2017 Hearing, ECF #57 at Pg. ID 1134), but he subsequently argued that Island Living was not entitled to that amount because it unreasonably delayed commencing the foreclosure. (*See id.* at Pg. ID 1134-35.)

On March 10, 2017, Swan Creek filed the instant motion in which it seeks an order terminating the receivership and requiring the Funds to be distributed to Swan Creek. (*See* ECF #44.) Swan Creek argues, among other things, that Island Living improperly drove up the amount of interest accruing under the Loan Documents by unreasonably delaying the foreclosure. (*See id.*) Swan Creek therefore insists that the Funds should be returned to it rather than applied to satisfy the artificially-inflated balance owing under the Loan Documents.

The Court held a hearing on the motion to terminate the receivership and distribute funds on July 27, 2017. At the conclusion of the hearing, it ordered the parties to submit supplemental briefs. The Court invited the parties to address in their supplemental briefs, among other things, whether it should hold an evidentiary hearing concerning Swan Creek's assertion that Island Living unreasonably delayed foreclosing on the park. Island Living and Swan Creek filed their supplemental briefs on September 8, 2017. (*See* ECF ## 60, 61.) Neither party requested an evidentiary hearing.

## II

"[A] district court has broad powers in fashioning relief in an equity receivership proceeding . . . ." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). "In addressing claims on the receivership estate brought before

it, the district court may consider both the merits of the individual claim and the equities attendant to the situation." *Id.* at 552.

## III

The question now before the Court is whether Island Living or Swan Creek is entitled to the Funds.[3] Swan Creek argues that it is entitled to the Funds for two alternative reasons: (1) Island Living's "delay in pursuing foreclosure precludes its ability to recover" the Funds and (2) Island Living's "right to [the Funds] was terminated on May 26, 2017, when Swan Creek made the redemption payment" and redeemed the park. (Def's Second Supp. Br., ECF #61 at Pg. ID 1396-97.) The Court addresses each of these contentions separately below.

### A

Swan Creek first argues that the Funds should not be used to satisfy its remaining debt under the Loan Documents because Island Living unreasonably inflated that debt by delaying the foreclosure process. Swan Creek contends that a substantial amount of default interest occurred during Island Living's unreasonable delay and that it would be improper to hold Swan Creek responsible for that

---

[3] As Swan Creek acknowledges in its motion to file a supplemental brief (*see* ECF #53), pursuant to the terms of the Court's order appointing the Receiver, the receivership terminated with the sale of the park. (*See* ECF #18 at ¶ 19.) As a result, Swan Creek's request to terminate the receivership is moot.

12

additional interest. (*See* Def's Mot. to Terminate, ECF #44 at Pg. ID 923-24; Def's Second Supp. Br., ECF #61 at Pg. ID 1397-1400.)

The parties devote substantial briefing to the legal question of whether a borrower in default may resist a lender's collection efforts on the basis that the lender unreasonably delayed in commencing the foreclosure proceedings and thereby improperly inflated the amount of the interest owed. (*See* Def's Second Supp. Br., ECF #61 at Pg. ID 1397-1400; Pl's Supp. Br., ECF #60 at Pg. ID 1177-81.) Swan Creek cites cases from outside of Michigan and Illinois in which courts have held that a lender may not recover all accrued interest where it has unreasonably delayed in initiating foreclosure proceedings or committed other misconduct in connection with the foreclosure process. Island Living counters that its alleged delay is no defense to its claim for accrued interest. Island Living contends that the broad language of the Loan Documents gave it substantial discretion to choose the timing of the foreclosure and that Swan Creek may not resist paying all amounts due under the Loan Documents based upon any alleged delay in the foreclosure process. (Pl's Supp. Br., ECF #60 at Pg. ID 1177-81.)

The Court need not decide the legal question of whether Swan Creek may invoke Island Living's alleged delay as a defense to Island Living's claim for all interest owing under the Loan Documents. The Court may avoid that legal question

because, even if a delay defense is available to Swan Creek, Swan Creek has not established that there was an unreasonable delay here.

The Monthly Reports reveal that Island Living was not merely biding its time and watching interest accrue between Swan Creek's default and the commencement of foreclosure proceedings. Instead, Island Living was, among other things, conducting environmental assessments of the mobile home park, exploring a sale of the park to a third party, discussing a possible transaction involving Swan Creek, and obtaining an appraisal of the park. Swan Creek has not contested the accuracy of the Monthly Reports, nor has it presented evidence that it urged Island Living to begin the foreclosure process prior to the time that Island Living did so. Under all of these circumstances, the Court cannot conclude that Island Living unreasonably delayed commencing the foreclosure process.

Indeed, Island Living's conduct here is far different from the conduct of the lenders in the cases cited by Swan Creek in which courts have found unreasonable delay. In the primary case cited by Swan Creek, *Citimortgage, Inc. v. Gueye*, the New York state trial court found an unreasonable delay where the lender did essentially *nothing* for *seven years* after the borrower's default. 38 N.Y.S.3d 830 (Table) (N.Y. Sup. Ct. 2016). Likewise, in *Pierce v. Emigrant Mortgage Co.*, 2007 WL 4800725, at *7-8 (D. Conn. Dec. 27, 2007), the district court precluded a lender from recovering all accrued interest where an attorney delayed commencing

foreclosure proceedings for a number of years and ignored the borrower's communications concerning efforts to cure the default. Finally, in *Eminent Mortgage Co. v. Crismara*, 2008 WL 2551039, at *11-12 (D. Conn. June 23, 2008), the district court found an unreasonable delay where the lender waited to foreclose while it engaged in forum shopping for its claims against the borrower. None of these circumstances are present in this case.

In sum, Swan Creek has not persuaded the Court that Island Living unreasonably delayed the foreclosure process.

**B**

Swan Creek also argues that its redemption of the park in May 2017 "terminated" Island Living's right to the Funds. This argument is easiest to understand when set forth in the following steps:

Step 1: The Loan Documents "preserved the applicability of Michigan's mortgage and assignment of rent statutes." (Def's Second Supp. Br., ECF #61 at Pg. ID 1394-95.)

Step 2: Under Michigan's assignment of rents statute, the assignment "must be connected to a mortgage." (*Id.* at Pg. ID 1395.)

Step 3: Once a mortgage is satisfied through redemption, the lender is no longer entitled to collect rents pursuant to an assignment of rents.

Step 4: Swan Creek satisfied the Mortgage when it paid the redemption amount. (*See id.*)

Step 5: When Swan Creek satisfied the Mortgage by making the redemption payment, that terminated Island Living's right to collect rents pursuant to the Assignment of Rents.

15

Step 6: Because Island Living had no post-redemption right to collect rents after Swan Creek made the redemption payment, the Receiver should have paid the Funds (which, again, consist largely of rents) to Swan Creek.

There is a fundamental flaw in this argument. It fails to acknowledge that – under the express terms of the Mortgage,[4] the Assignment of Rents,[5] and Michigan law – Island Living owned the rents that were paid before the redemption even though these rents were in the possession of the Receiver. *See In Re Town Ctr. Flats, LLC*, 855 F.3d 721, 727 (6th Cir. 2017) (holding that under Michigan law, an assignment of rents transfers ownership of the rents to the assignee and that the assignor holds no residual property rights in the rents). Swan Creek did not retroactively divest Island Living of its ownership of the rents when Swan Creek made the redemption payment. Nor did Swan Creek retroactively reinstate its license to collect rents under the Assignment of Rents – which terminated upon its default – by making the redemption payment. Moreover, the fact that the Receiver had not yet transferred the rents to Island Living before Swan Creek made the

---

[4] *See* Mortgage at § 52(b), ECF #1-5 at Pg. ID 82 ("Upon the occurrence of an Event of Default and without any action by Lender, Borrower shall have no further right to collect or otherwise receive such Rents, which will be the absolute and sole property of Lender pursuant to those statutes.").

[5] *See* Assignment of Rents at § 3.1, ECF #1-6 at Pg. ID 97 ("Upon or at any time after the occurrence of … an Event of Default . . . Lender shall immediately be entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property.").

redemption payment did not diminish Island Living's already-vested right to the rents. Indeed, the Receiver was, in effect, holding the rents for Island Living. Simply put, at the time Swan Creek made the redemption payment, Island Living was *already entitled to all rents that the Receiver had previously collected*, and those rents therefore rightfully belong to Island Living.

This case is materially distinguishable from the primary case on which Swan Creek relies, *1040 South Main St. Holdings, L.L.C. v. LARS Assocs.* No. 12-12143, 2012 WL 6047454 (E.D. Mich. Dec. 5, 2012). In that case, upon the borrower's default, the lender directed the tenants at the mortgaged property to send any rental payments to its office. *See id.* at *1. The borrower later redeemed the mortgage, and the lender sought to continue receiving rents paid *after the redemption* to satisfy the borrower's debt. *See id.* A judge of this Court held that the lender was not entitled to those rents and explained that "once the redemption of the property has been accomplished, the [lender] is no longer entitled to the rental income." *Id.* at *4. Here, sharp in contrast, the rents at issue were paid *before* Swan Creek redeemed the Mortgage, and, as explained above, Island Living plainly *did* have the right to the rents at the time they were paid. Thus, *1040 South Main St. Holdings, L.L.C.,* does not support Swan Creek's claim to the Funds.

## IV

For all of the reasons stated above, **IT IS HEREBY ORDERED** that Swan Creek's Motion to Terminate Receivership and Distribute Funds (ECF #44) is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: October 23, 2017

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 23, 2017, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764
